**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

VIRTUS PHARMACEUTICALS, LLC, and
VIRTUS PHARMACEUTICALS OPCO II, LLC,

        CASE NO. _____

       Plaintiffs,

       v.

FOOD AND DRUG ADMINISTRATION,
ROBERT CALIFF, M.D., DEPARTMENT OF
HEALTH AND HUMAN SERVICES and
SYLVIA MATHEWS BURWELL,

       Defendants.

_____

**COMPLAINT**
**(Injunctive Relief Sought)**

Plaintiffs Virtus Pharmaceuticals, LLC ("Virtus Pharmaceuticals") and Virtus

Pharmaceutical OPCO II, LLC ("Virtus OPCO") (collectively "Virtus") file this Complaint

against Defendants Food and Drug Administration ("FDA"), Robert Califf, M.D. ("Dr. Califf"),

The Department Of Health and Human Services ("HHS"), and Sylvia Mathews Burwell

("Burwell") (collectively "FDA").

The Complaint involves certain potassium chloride ("KCl") products that have been

marketed by Virtus, and registered with FDA, since 2012.   FDA is threatening to take

enforcement action against Virtus in violation of its own regulations and long standing policies

in order to provide an unlawful drug monopoly to a KCl product marketed by one of Virtus'

competitors.   FDA has not alleged that Virtus' KCl product is unsafe or ineffective.   Nor, despite

repeated requests, has FDA explained why it believes it can expand its statutory charter by

deviating from its own regulations regarding KCl products through threatened enforcement

action and the granting of exclusivities to certain companies at the expense of others.   Virtus alleges as follows:

## Nature of this Case

1.      KCl has been a safe and effective treatment for certain conditions for over 100 years.  FDA and HHS have repeatedly acknowledged that KCl falls under certain "grandfather" provisions in the FDA statutory framework, which means it has never been required to be subject to formal FDA approval.

2.      Virtus sells KCl.  FDA is threatening enforcement action against Virtus' KCl product, despite no allegations that the product is unsafe or ineffective.  FDA does not have the power to remove safe and effective KCl drugs from the market in the face of its own regulations, its own official regulatory actions, and its own statements to other government officials stating that these products are lawfully marketed.  Virtus seeks a declaration stating as much.

3.      Virtus bring this case to:  (1) obtain a declaratory judgment that FDA may not take enforcement action against Virtus' KCl product without a formal and specific determination that the product is either unsafe or ineffective; (2) require that FDA engage in appropriate procedures under the Administrative Procedures Act prior to taking any such action against Virtus' KCl; and (3) set aside FDA's unlawful rule, "Guidance for FDA Staff and Industry—Marketed Unapproved Drugs—Compliance Policy Guide, Sect. 440.100 *Marketed New Drugs Without Approved NDAs or ANDAs*" (September 19, 2011) ("the 2011 Guidance"), at least as it applies to KCl products.

## The Parties

4.      Virtus Pharmaceuticals, LLC is a Delaware limited liability company with its corporate headquarters located at 2649 Causeway Center Drive, Tampa, Florida 33619.

5.      Virtus OPCO is a Delaware limited liability company located in Nashville, Tennessee.  Virtus OPCO is listed on the FDA's Drug Establishment Current Registration Site. Virtus OPCO distributes and sells KCl powder in the United States on behalf of Virtus Pharmaceuticals, LLC.  Virtus OPCO's KCl Powder is sold in the United States and is available by prescription only.

6.      Defendant FDA is an agency of the United States Government within the United States Department of Health and Human Services, with an office at 10903 New Hampshire Ave., Silver Spring, MD 20993.  The Secretary of Health and Human Services has delegated to FDA the authority to administer the relevant provisions of the Act, 21 U.S.C. §§ 387a, 387a-1.

7.      Defendant Robert Califf, M.D., is the Commissioner of Food and Drugs and is the senior official of the FDA.  He is sued in his official capacity.  Dr. Califf maintains an office at 10903 New Hampshire Ave., Silver Spring, MD 20993.

8.      Defendant United States Department of Health and Human Services is a federal department with an office at 200 Independence Avenue SW, Washington, D.C. 20201.  FDA is an agency within HHS.

9.      Defendant Sylvia Mathews Burwell is the Secretary of Health and Human Services.  She is sued in her official capacity.  Burwell maintains an office at 200 Independence Avenue SW, Washington, DC 20201.

**Jurisdiction and Venue**

10.     This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 et seq. and the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §301 et seq. The Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 2201-02.

11.     Judicial review is authorized by the APA, U.S.C. § 701 et seq., which provides for judicial review of agency actions.

12.     Venue is proper under 28 U.S.C. § 1391(e) because Plaintiff Virtus Pharmaceuticals, LLC resides in this district and no real property is involved in this action.

### Background

13.     In order to fully understand the allegations contained herein regarding FDA's agency overreach and the arbitrary prejudicial effect of that overreach, Virtus provides the background information below.

A.     **The Statutory Scheme That Gave Rise To FDA Review Of New Drugs.**

14.     In 1906 the Federal Food and Drugs Act (the "1906 Act") created the federal regulatory scheme and the agency now known as FDA.   The 1906 act did not require prescription drug products be approved by FDA.

15.     In 1938, the Federal Food, Drug, and Cosmetic Act (the "FDDCA") for the first time required that new drugs be approved for safety before they could be marketed.   The FDDCA states that drugs on the market prior to 1938 are exempt from the FDA approval process under certain conditions.   Specifically, the law states that a drug will not be considered to be a "new drug" that requires an approved application from FDA prior to marketing "if at any time prior to June 25, 1938, it was subject to the Food and Drugs Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use." FFDCA § 201(p)(1).

16.     In 1962, the FDDCA was amended (the "1962 Drug Amendments"), and these amendments specifically required that "new drugs" be found to be effective in addition to being safe in order to be approved by FDA and allowed to enter the market.   The 1962 Drug Amendments also contained a grandfather clause that stated that the new requirements for effectiveness would not apply to drugs that were on the market prior to the enactment date of enactment of October 9, 1962.   Specifically, the law stated that "any drug which, on the day

immediately preceding the enactment date [of October 9, 1962], (A) was commercially used or sold in the United States, (B) was not a new drug as defined by [FFDCA § 201(p)(1)], and (C) was not covered by an effective application under section 505 of that Act, [then] the amendments to [FFDCA § 201(p)] made by this Act [requiring that new drugs be shown to be effective] shall not apply to such drug when intended solely for use under the conditions prescribed, recommended, or suggested in labeling with respect to such drug on that day." *See* Drug Amendments of 1962, Pub. L. 87-781 § 107(c)(4), 76 Stat. 780, 789.

17.     In addition to grandfathered drugs being exempt from the new drug requirements of obtaining approved applications from FDA, drugs are also exempt from "new drug" review if they have been generally recognized as safe and effective ("GRASE"). In order to qualify as a GRASE drug, the drug product must have been: (1) generally recognized by experts as safe and effective for its labeled indications; and (2) marketed for a material time to a material extent. FFDCA § 201(p); *Premo Pharmaceutical Laboratories, Inc. v. U.S.*, 629 F.2d 795, 801–802 (2nd Cir. 1980).

18.     The net result of the grandfather and GRASE exceptions to the definition of "new drug" amendments is that there are hundreds, if not thousands, of "marketed unapproved drugs" legally sold as drug products in the United States.

**B.    KCl Is A Drug That Existed Long Before 1938.**

19.     KCl is a drug that is used to treat patients suffering from potassium deficiency. Potassium is a vital mineral for the human body and participates in a number of essential physiological processes including the maintenance of intracellular tonicity; the transmission of nerve impulses; the contraction of cardiac, skeletal, and smooth muscle; and the maintenance of normal renal function.

20.     Some patients require external supplemental potassium in order to prevent hypokalemia (the medical name for a potassium deficiency). Hypokalemia can be life-threatening and increases the risk of death in patients with cardiovascular disease.

21.     Use of KCl for various diseases and medical conditions and has been described in medical texts for more than one hundred and twenty years. *See*, Ringer, S., *A Further Contribution Regarding The Influence Of The Different Constituents Of The Blood On The Contraction Of The Heart*, J. PHYSIOL. 1883 Jan; 4(1): 29–42.3; Addison, W.L, *The Use Of Sodium Chloride, Potassium Chloride Sodium Bromide, And Potassium Bromide In Cases Of Arterial Hypertension Which Are Amenable To Potassium Chloride*, CAN MED. ASSOC. J., 1928 Mar.; 18(3): 281–285; Laurent & Lond, *The Influence Of Large Doses Of Potassium Chloride On Myasthenia Gravis*, THE LANCET, June 22, 1935 at 1434-35. Furthermore, the 1942-43 *Pharmacists Reference Guide* lists KCl in its Drug Products Price book.

**C.     FDA Has Already Enacted Regulations That State The Narrow Set Of Circumstances When It Will Take Enforcement Action Against KCl Products.**

22.     First, FDA's own regulations state that FDA will not take action against a KCl drug product unless that product fails to meet certain requirements under 21 CFR § 201.306(b). Under this regulation, the FDA may not initiate regulatory proceedings against any KCl product that supplies 20 milligrams or more of potassium per milliliter, labeled or intended for human use if the following conditions are met: "(1) the labeling of the drug bears the prescription statement quoted in section 503(b)(4) of the Federal Food, Drug, and Cosmetic Act; and (2) the labeling on or within the package from which the drug is to be dispensed bears adequate information for its use by practitioners in accord with ... 201.100." Virtus's product meets these requirements, and thus FDA is precluded by the clear language of its own regulations from taking enforcement action absent a specific health and safety concern.

23.     Second, FDA has previously explained that 21 CFR § 201.306 was intended to bind the agency when it regulates KCl products.  In a preamble to related regulations, FDA admitted that 21 CFR § 201.306 "was intended to advise manufacturers of the products described therein that the FDA would initiate no regulatory action with respect to the continued marketing of such products without giving prior notice of such action to the manufacturers." 41 Fed. Reg. 14568, 14569 (Apr. 6, 1976).

24.     Third, FDA has informed other governmental agencies in the past that products like Virtus's KCl do not require FDA approval in order to be marketed. *See, e.g., Letter from Herbert M. Friedman, Assistant to the Director, Division of Drug Labeling Compliance, to Ron Gottrich, Administrator, Drug Product Selector Program, Division of Food and Drugs, Illinois Department of Public Health* (Jun. 9, 1981) (stating that various KCl liquid and powder solution preparations "do not presently require an approved NDA/ANDA, but any firm marketing such a product must be in compliance with regulation 21 CFR 201.306");  *Letter from Herbert M. Friedman, Assistant to the Director, Division of Drug Labeling Compliance, to Mr. Virgil L. Conrad, Commissioner, S.C. Department of Social Services* (Apr. 24, 1981) (stating that various KCl liquid and powder solution preparations "do not presently require an approved NDA/ANDA, but any firm marketing such a product must be in compliance with regulation 21 CFR 201.306").

25.     Finally, the U.S. Department of Health and Human Services in conjunction with FDA, has previously engaged in notice-and-comment rulemaking and concluded that KCl solution drug products are lawfully sold grandfathered drug products. Under the regulations at the time, the government's Pharmaceutical Reimbursement Board under the Health Care Financing Administration ("HCFA") (later known as the Centers for Medicare and Medicaid

Services ("CMS")) established maximum allowable costs ("MAC") for multiple source pharmaceutical products. 45 CFR § 19.5 (1980). On January 21, 1980, the Pharmaceutical Reimbursement Board issued a proposed rule and announced a public hearing on these MAC limits for KCl. In accordance with 45 CFR § 19.5(b), FDA was required to provide advice to the Pharmaceutical Reimbursement Board in this matter. Significantly, in the preamble to the final rule for the MAC limit for KCl, HCFA highlights the fact that it consulted with FDA and that FDA notified the Board of the regulatory status of KCl. In that preamble, HCFA states the following:

> On August 3,1979, in response to the Board's request, the FDA notified the Board that **potassium chloride in an oral solution form has been marketed since before 1938 and therefore, the FDA does not require an approved New Drug Application as a condition of marketing. There is a monograph for the product in the United States Pharmacopeia which provides a public standard for its quality. The FDA is not aware of any bioequivalence issues associated with the different brands of this drug product,** no bioequivalence problems have been reported in the literature, and no bioequivalence requirement regulation is anticipated. Further, the FDA stated that it knew of no pending regulatory or quality problems which would prevent or delay the establishment of a MAC limit for this product.

45 Fed. Reg. 70,574, 70,577–78 (Oct. 24, 1980) (emphasis added).

26.    As a result of this decision, HCFA set a MAC for KCl drug products and allowed them to be reimbursed under the law without requiring FDA approval as per the instructions of FDA. Thus, HHS in conjunction with FDA made a previous regulatory determination that KCl drug products as a class of drugs have been marketed since before 1938 and did not require FDA approval prior to marketing.

27.    CMS reiterated the same position as recently as 2012 when it identified KCl as an unapproved drug that was legally marketed and could be reimbursed by the federal government.

In the preamble to CMS's proposed rule on Covered Outpatient Drugs, CMS states the following:

> We are also aware that some products that do not have an approved application number may be covered outpatient drugs. For example, we believe that certain products, such as prenatal prescription vitamins, *potassium chloride*, codeine sulfate, and hydrocortisone acetate may fall into this category. If a product does not have an FDA application number, in order to be considered a covered outpatient drug, the manufacturer must provide evidence demonstrating that its products meet the statutory definition of a covered outpatient drug under section 1927(k)(2) to 1927(k)(4) [which includes grandfathered drugs].

77 Fed. Reg. 5318, 5323 (Feb. 2012) (emphasis added).

28.     Thus, it is clear from the information above that HHS in conjunction with FDA, has already determined through regulations carrying the force of law, and has maintained for decades, that these drug products are lawfully sold pre-1938 drug products.

29.     The National Drug Code ("NDC") Directory currently lists 28 different unapproved KCl drug products on the market with some being sold as far back as 1969.

**D.     FDA's Attempt To Eradicate Safe And Effective Marketed Unapproved Drugs.**

30.     In September of 2011, FDA promulgated "Guidance for FDA Staff and Industry Marketed Unapproved Drugs Compliance Policy Guide, Sec. 440.100 *Marketed New Drugs Without Approved NDAs or ANDAs*" (the "2011 Guidance").

31.     The 2011 Guidance states that it "describes how we [FDA] intend to exercise our enforcement discretion with regard to drugs marketed in the United States that do not have required FDA approval for marketing." (*Id.* at 1.)

32.     The 2011 Guidance further states that "[f]or historical reasons, some drugs are available in the United States that lack required FDA approval for marketing." (*Id.*)

33.     The 2011 Guidance admits that "we [FDA] first have to identify illegally marketed products before we can contemplate enforcement action." (*Id.* at 3.)

34.     FDA lists its enforcement priorities in the 2011 Guidance, understandably beginning with drugs that are unsafe, ineffective, or fraudulent. But the 2011 Guidance does not stop there. It also states that FDA will begin enforcement actions against "unapproved drugs that directly compete with an approved drug" without limitation—*i.e.* any pre-1968 grandfathered or safe and effective drug that competes with a drug that went through the current onerous approval process. (*Id.* at 5.)

35.     FDA argues in the 2011 Guidance that "[t]argeting drugs that challenge the drug approval or OTC drug monograph systems buttresses the integrity of these systems and makes it more likely that firms will comply with the new drug approval and monograph requirements, which benefits the public health." (*Id.*) The end result of their approach, according to FDA, is to require that all drugs be approved by FDA through either the NDA process or the "Abbreviated New Drug Application" ("ANDA") process—both of which require the commitment of significant resources and which take years to complete due to FDA's backlog.

36.     Nothing in the 2011 Guidance provides a basis in statute or FDA regulation for the power to engage in seizure and/or enforcement actions against safe and effective and/or grandfathered drugs for the reasons outlined above in the absence of formal rule making or administrative procedures.

37.     The 2011 Guidance further explains that "FDA is not required to, and generally does not intend to, give special notice that a drug product may be subject to enforcement action, unless FDA determines that notice is necessary or appropriate to protect the public health. The issuance of this guidance is intended to provide notice that any product that is being marketed illegally is subject to FDA enforcement action at any time." (*Id.* at 5-6.)

38.     The 2011 Guidance also states that "[c]ompanies should be aware that a Warning Letter may not be sent before initiation of enforcement action and should not expect any grace period that is granted to protect them from the need to leave the market for some period of time while obtaining approval." (*Id.* at 8.)

39.     The 2011 Guidance also explains that FDA, through its enforcement actions, is intentionally attempting to effectuate non-statutory, FDA-granted, exclusivity (*i.e.* monopoly) for the company that first files a new drug application for these old "grandfathered" drugs:

> For example, if FDA provides a 1-year grace period before it takes action to remove unapproved competitors from the market, and it takes 2 years for a second application to be approved, the first approved product could have 1 year of market exclusivity before the onset of competition. If FDA provides for a shorter grace period, the period of effective exclusivity could be longer. **FDA hopes that this period of market exclusivity will provide an incentive to firms to be the first to obtain approval to market a previously unapproved drug.**

(*Id.* at 8 (emphasis added).)

40.     Every other exclusivity period granted by FDA (*e.g.* pediatric, new chemical entity, or ANDA first filer) is rooted in a statutory grant by Congress.   Nothing in the 2011 Guidance provides any reasoning as to why the FDA thinks it has the power to grant monopolies without Congressional approval, particularly on old "grandfathered" drugs that have been freely available for over 50 years.  *See* 21 U.S.C. § 505(c)(3)(E) and 505(j)(5)(F) (new drug exclusivity);   21 U.S.C. § 360aa (orphan drug exclusivity);   21 U.S.C. § 355(c)(3)(E)(ii), (j)(5)(F)(ii)) (new chemical entity exclusivity); 21 U.S.C. § 355(c)(3)(E)(iii), (j)(5)(F)(iii)-(iv) (new clinical study exclusivity); 21 U.S.C. § 355(j)(5)(B)(iv)) (ANDA exclusivity).

41.     Confusingly, the 2011 Guidance also notes in its appendix that "[u]nder the 1938 grandfather clause (see 21 U.S.C. 321(p)(1)), a drug product that was on the market prior to passage of the FDCA and which contained in its labeling the same representations concerning

the conditions of use as it did prior to passage of that act was not considered a new drug and therefore was exempt from the requirement of having an approved new drug application." (*Id.* at 11.)

42. The 2011 Guidance also admits that "[u]nder the 1962 grandfather clause, the FD&C Act exempts a drug from the effectiveness requirements if its composition and labeling has not changed since 1962 and if, on the day before the 1962 Amendments became effective, it was (a) used or sold commercially in the United States, (b) not a new drug as defined by the FD&C Act at that time, and (c) not covered by an effective application. See Public Law 87-781, section 107." (*Id.* at 11-12.)

43. The 2011 Guidance also acknowledges that "a product would not be considered a new drug [and therefore not subject to review] if it is generally recognized as safe and effective (GRAS/GRAE) and has been used to a material extent and for a material time. See 21 U.S.C. 321(p)(1) and (2)." (*Id.* at 12.)

44. After explaining that the statutes which provide for the existence of the FDA specifically exempt certain drugs, the 2011 Guidance states, despite the plethora of statements by FDA over the years to the contrary, that the "Agency believes it is not likely that any currently marketed prescription drug product is grandfathered or is otherwise not a new drug." (*Id.*)

E.    **Virtus' Competitors Filed NDAs For Already-Marketed KCl Products Identical To Virtus' In All Material Respects.**

45. By August of 2015, two of Virtus' competitors obtained the first NDAs for KCl products. As noted above, prior to these approvals, these types of KCl drug products had all been sold without FDA approval. FDA itself acknowledges this in the recent Summary Basis of Approvals ("SBAs") for the NDAs, stating that the products could be approved without testing in humans based on "published literature" for unapproved marketed products.

46.     FDA also states on its website, "Drugs@FDA", for both NDA 208019 and NDA 206814 that these KCl products were classified as drug products that were "already marketed without an approved NDA."

47.     Virtus has reason to believe that the NDAs in question were obtained fraudulently, and so informed FDA via citizen's petition. (*Available at* https://www.regulations.gov/document?D=FDA-2016-P-2029-0001.)

**F.     FDA Initiated Enforcement Procedures Against Virtus After Approving Competitors' NDAs, Despite No Evidence Of Safety Or Efficacy Issues With Virtus' KCl Product.**

48.     On June 16, 2016, Virtus received a communication from FDA regarding its KCl product stating that "[a]s you may know, Lehigh Valley/Qualitest has received approval of this product last year." And that "[t]he agency is contacting all manufacturers/distributors of this product to get an understanding of the supply/market/demand."

49.     On June 21, 2016, FDA requested that Virtus attend a June 28, 2016, teleconference regarding its KCl product.  Following the June 28, 2016, teleconference, FDA sent an e-mail that stated:

> This is a follow-up to our conversation today requesting that Viva stop production within 45 days of today (August 12, 2016) and Virtus stop distribution within 90 days of today (September 26, 2016), of its unapproved KCl powder for oral solution products. **Please provide a statement of your voluntary halt to production and distribution with clear agreement to the timeframes by close of business tomorrow** (June 29, 2016).

(emphasis added.)  Virtus provided no such commitment.

50.     On June 29, 2016, Virtus sent correspondence to FDA which stated that "[a]lthough we understand the Agency's desire for a prompt response to its request, please appreciate that this is a significant product for Virtus which necessitates discussing our future actions regarding this product amongst our senior management as well as our Board of Directors

to come to a decision on this matter." The same correspondence sought answers to five

questions regarding FDA's stance on Virtus' KCl product:

> 1.      It is our understanding that FDA informed us that it is announcing the same action against all similar potassium chloride drug products in this space without approved applications and is providing the same timelines for leaving the market. Is this correct?

> 2.      Is the FDA willing to consider alternative timeframes for exiting the market if evidence is provided that an alternative time frame would ameliorate the effect that leaving the market suddenly may have on the public health, drug shortage, and pricing?

> 3.      Does the FDA consider its recent discussions with Virtus regarding potassium chloride to be final agency action?

> 4.      Are there specific reasons why FDA has decided to not allow for a longer grace period before announcing enforcement action, which FDA has done in the past? http://www.fda.gov/downloads/drugs/guidancecomplianceregulatory information/guidances/ucm070290.pdf ("[I]n 1997, FDA issued a Federal Register notice declaring all orally administered levothyroxine sodium products to be new drugs and requiring manufacturers to obtain approved new drug applications (62 FR 43535, August 14, 1997). Nevertheless, FDA gave manufacturers 3 years (later extended to 4 (65 FR 24488, April 26, 2000)) to obtain approved applications and allowed continued marketing without approved new drug applications…").

> 5.      Is there a specific reason why FDA is demanding immediate action now on a drug product that safety and efficacy is well established (e.g., the NDA for Potassium Chloride oral solution did not require clinical studies) and sold for decades with no FDA action?

51.    On July 7, 2016, FDA responded to the first four questions in Virtus's June 29,

2016, email, but did not even acknowledge the fifth question regarding the absence of any safety

or efficacy issues with Virtus' KCl product:

> 1.)      Yes, **FDA made the same request of all companies that manufacture and distribute unapproved potassium chloride products** on the Tuesday, June 28, 2016 and provided the same timeframes for ceasing the manufacturing and distribution of this unapproved product.

> 2.)      No, **the FDA is not willing to consider alternative timeframes for the cessation of marketing of this unapproved drug product.** We initiated our

request of all companies after we had full confidence that this request would not pose a risk of shortage for patients.

3.)      No, the FDA made a request for your firm to voluntarily cease manufacturing and distribution of an unapproved [sic]. **A request for voluntary compliance with the law is not considered final agency action**.

4.)    The timeframes for cessation of manufacturing and marketing are consistent with those we have implemented in other actions to seek removal of unapproved drugs in recent years.  It is based on an assessment of the time required to ensure an orderly transition in the market from unapproved drugs to drugs that are FDA-approved.

52.    At bottom, FDA requested Virtus "voluntarily" cease selling KCl, but would provide no explanation for why Virtus should do so, or provide any reason why FDA had the power to remove a safe and effective drug from the market.  FDA did this while attempting to color their actions as "non-final" to avoid judicial review.

53.    On July 11, 2016, Virtus filed a citizen's petition with FDA regarding the NDA products that explained that those products were likely obtained through fraud, making the NDAs invalid.  The same day Virtus sent an email to FDA highlighting the issues in the citizen's petition and stating that "[g]iven the serious nature of the issues described in the attached filed petition, we believe that it is of paramount importance that these issues be reviewed and resolved by FDA prior to the removal of any potassium chloride drug products from the market."

54.    On August 3, 2016, Virtus' counsel sent yet another letter to FDA, requesting a meeting in which it explained that "[w]e have not yet heard back from FDA regarding this request for an investigation. Given FDA's previous timeline regarding potassium chloride for oral solution drug products, it is of paramount importance to discuss this issue with the Agency as soon as possible to understand FDA's current position on this matter."

55.    FDA's response to the August 3, 2016 letter was simply "[w]e have taken your meeting request under advisement and will let you know when we are able to provide an

answer." On August 10, 2016 FDA responded to that request and scheduled a meeting for September 6, 2016.

56.    On August 23, 2016, Virtus' counsel reached out to FDA and asked who would be attending the meeting and whether Virtus could do anything in advance of the meeting to prepare. On August 26, 2016, FDA responded that "we will need to postpone the listening meeting we had planned for September 6 to a future date" without providing any reasoning for the postponement or offering alternative dates for a meeting.

57.    On August 29, 2016, Virtus' counsel again reached out to FDA regarding questions about the approved NDA's and the status of Virtus' products.   FDA responded on September 2, 2016, with the following:

> As you have requested, we will let you know when we have additional information about rescheduling the meeting.
>
> As you know, on June 28 we requested that all manufacturers and distributors of unapproved potassium chloride for oral solution agree to voluntarily cease marketing this product.   The timeframes we provide were 45 days to stop manufacturing and 90 days to stop distribution.
>
> Consistent with the time frames we provided on June 28, **FDA will no longer exercise enforcement discretion with regard to the marketing of unapproved potassium chloride for oral solution after September 26, the 90-day benchmark to cease distribution.**   This applies to all firms manufacturing and distributing unapproved potassium chloride for oral solution.
>
> As a matter of policy, the FDA does not confirm or deny the existence of any investigation.
>
> Any question Virtus has about seeking FDA approval of this product should be directed to the Office of Generic Drugs (OGD).

(emphasis added.)

58.    At this point, FDA had explicitly told Virtus that it would engage in enforcement action, as it would "no longer exercise enforcement discretion," but at the same time FDA still

refused to engage in any substantive communication. In addition, FDA advised the KCl NDA filer, who in turn publicized to the market customers, that it advised Virtus (and other potassium chloride powder manufacturers) to cease manufacturing by the end of August and cease selling by the end of September.

59.     On September 27, 2016, Virtus' counsel again sent a letter to FDA, noting that "Virtus was unable to meet with FDA before the suggested deadline of September 26. Therefore, in order to give FDA time to reschedule the parties' meeting to discuss these issues, on September 26, 2016, Virtus agreed to [temporarily] suspend production and distribution of its old potassium chloride drug products until October 10, 2016." In the same letter Virtus explained to the FDA that

> **We believe that meeting with FDA is vital in order to discuss with FDA the complexity and seriousness of the current matter**. We believe our Citizen Petition raises serious and legitimate questions about the validity of NDAs No. 208019 and No. 206814. Additionally, we believe that if FDA were to act in a precipitous manner, the result could be a shortage of potassium chloride on the market that would present risks to the public health as well as unnecessary high prices for these drugs. **Already the price of liquid potassium chloride has more than doubled in less than one year due to the removal of old products from the market**. Furthermore, if FDA moves forward with removing all old potassium chloride drug products, it will be removing 95% of the product available potentially creating a significant shortage for the 7 to 8 million patients who need this product. If FDA later determines that NDA Nos. 208019 and 206814 were obtained through fraud and need to be withdrawn, then there will be no potassium chloride solution drug products available to consumers. Thus, **it is imperative to the public health that FDA analyze the complexity of this situation carefully before acting**.

(emphasis added.)

60.     On October 5, 2016 FDA (through the Acting Director of the Center for Drug Evaluation and Research) informed Virtus that

> **You have made several requests to meet to discuss the disposition of Virtus' unapproved potassium chloride products** and Citizen Petition FDA-2016-P-2029, which you filed on behalf of Virtus. This Citizen Petition asks FDA "to

officially request an investigation of NDA Nos. 208019 and 206814 as well as to request that FDA refrain from taking any action against any other old potassium chloride drug products until this matter has been reviewed and resolved." **In order to protect the integrity of the Citizen Petition process, FDA generally refrains from meeting with petitioners and other parties to discuss pending petitions.** Your meeting requests were declined for that reason.

Please note also that FDA has not made a decision about enforcement actions pertaining to Virtus' unapproved potassium chloride products.

(emphasis added.)

61.     On October 6, 2016, Virtus' counsel sent a detailed email to FDA, with several attachments, explaining that :

> In light of FDA's prior comments on this matter, we respectfully ask for clarification. As explained below, we believe that FDA is required to provide formal notice before instituting enforcement actions due to FDA's past regulatory actions and official statements relating to potassium chloride. Because FDA has not yet made a decision regarding enforcement action against Virtus's potassium chloride products and does not intend to meet with Virtus to discuss these issues, please inform us if the Agency will provide Virtus with advance notice of its decision regarding enforcement prior to taking any enforcement actions against the company. We kindly request a response on this matter by October 11, 2016, and the courtesy of your response is appreciated.

62.     The 90-day timeframe offered by FDA to withdraw Virtus' KCl product has lapsed and it is Virtus' understanding based on the above communications that FDA stands to commence enforcement action against Virtus' KCl products. FDA has not withdrawn its prior statements published to the market that it would remove all the previously "grandfathered" KCl products from the market.

**FIRST CLAIM FOR RELIEF**

**Violation of the APA—Action By FDA Inconsistent
With FDA's Duly-Enacted Regulations And Established Policy**

63.    The above paragraphs are incorporated herein by reference.

64.    The APA, 5 U.S.C. § 706(2)(A), provides that a reviewing court shall hold
unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with law.

65.    Here, for the reasons stated above, any enforcement action would be inconsistent
with FDA's own regulations, which specifically state that it will not engage in enforcement
actions against KCl products except in specific circumstances, none of which are present here.
These regulations have the force of law.

66.    21 CFR § 201.306, which was enacted through formal notice and comment
rulemaking, explicitly lists the circumstances under which KCl products would be subject to
enforcement action, and there is no dispute that none of those circumstances exist here.

67.    Virtus is entitled to a declaration that any attempt by FDA to commence
enforcement action against Virtus' KCl products despite the clear mandate of 21 CFR § 201.306
would be arbitrary and capricious and in violation of the APA.

**SECOND CLAIM FOR RELIEF**

**Violation of APA—Arbitrary and Capricious Agency Action
Action Against Virtus Based On The Nonbinding Guidance Is Contrary To Law**

68.    The above paragraphs are incorporated herein by reference.

69.    The APA, 5 U.S.C. § 706(2)(A), (c), provides that a reviewing court shall hold
unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law, and that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

70.     The FDA has already stated that Virtus' KCl product is safe and effective, therefore Action against Virtus based on the nonbinding 2011 Guidance is contrary to law.

71.     The 2011 Guidance's attempt to force preexisting lawful unapproved drugs through the New Drug Application (NDA) process set forth in the FDCA will result in "expensive and time-consuming" efforts. *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1079 (D.C. Cir. 2001).

72.     If FDA's overreach of authority is allowed here, the NDA and ANDA pathway is the only avenue open to Virtus' KCl product.

73.     Thus, under the 2011 Guidance, Virtus will be required to file and obtain FDA approval for its KCl product.  Other KCl manufacturers will likewise be required to go through the NDA or ANDA process for all of the KCl products they sell.  The 2011 Guidance fails to come to grips with the extraordinary burden this approval regime will have, both on manufacturers and on FDA itself.  The specific facts surrounding FDA's approach to this particular product based on the historical FDA position and regulations dealing with KCl makes FDA's position especially burdensome because it was unanticipated, placing KCl manufacturers at a disadvantage while they work to comply with this guidance.  Effectively the FDA is changing 100 years' worth of practice on the product, which creates a burden on manufacturers, FDA and patients alike.

74.     The 2011 Guidance also arbitrarily discounts the safety benefits offered by KCl powder.

75.     Despite decades of use and recognition by the FDA as generally recognized as safe and effective ("GRASE"), the 2011 Guidance subjects KCl to the same extensive regulatory regime designed for new drugs.

76.     The 2011 Guidance is particularly arbitrary in its grant of effective market exclusivity for a company that obtains NDA approval for a product like KCl that other companies have been marketing without approval for many decades.  The 2011 Guidance does not articulate a reasoned basis for imposing such a *de facto* moratorium on a drug formulation that has previously been widely available with a very well established safety profile.  Nor does the 2011 Guidance come to grips with the reality that the removal of existing KCl products for alleged non-compliance will only serve to harm consumers through significantly reduced competition and increased prices in a previously competitive market.

77.     The net effect of the 2011 Guidance is a regime that arbitrarily frustrates the interests of public health. The 2011 Guidance does not adequately explain how this regime serves the public interest or the Act's goals.

### THIRD CLAIM FOR RELIEF

**Violation of the APA**
**The Guidance - If Deemed To Have Any Force Of Law - Exceeds FDA Authority**

78.     The above paragraphs are incorporated herein by reference.

79.     The APA, 5 U.S.C. § 706(2)(A), (C)-(D), provides that a reviewing court shall hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law."

80.     The 2011 Guidance is unlawful when judged against that standard.

81.     The 2011 Guidance is particularly improper in that the FDA has endeavored, without going through the necessary notice-and-comment requirements of the APA, 5 U.S.C. § 553, to grant market exclusivity to a company that obtains NDA approval for a product like KCl that other companies have been marketing lawfully without FDA NDA approval for many decades.  The 2011 Guidance does not articulate a reasoned basis for imposing substantive duties on the regulated public on a drug that previously has been widely available with a very well established safety and effectiveness profile.  Nevertheless, FDA in its 2011 Guidance seeks to impose substantive rights and limitations on the regulated public without subjecting its attempt to make law to the notice-and-comment limitations inherent under the APA.

82.     FDA's effort to create private drug monopolies invades the right of Congress, which has retained the sole right to grant drug exclusivities and has not delegated that power to FDA.

83.     The net effect of FDA's attempt to circumvent the proper notice-and-comment strictures of the APA is to improperly allow FDA the unbridled ability to create a regime that arbitrarily frustrates the interests of public health. The 2011 Guidance does not adequately explain how this regime serves the public interest or the FDCA's goals.

## PRAYER FOR RELIEF

WHEREFORE, Virtus asks that this Court issue judgment in its favor and against Defendants, and to grant the following relief:

1.   Declare that:

    i.   FDA may not contradict its own regulations regarding Potassium Chloride without engaging in formal rulemaking procedures under the APA.

    ii.   The 2011 Guidance is contrary to and exceeds FDA's statutory authority under the FDCA; and

    ii.   The 2011 Guidance is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law inasmuch as it grants monopolies without formal rule making or statutory guidance.

2.   Declare that FDA may not take any enforcement action against Virtus' KCl products inconsistent with 21 CFR § 201.306.

3.   Issue a preliminary injunction enjoining enforcement of the 2011 Guidance and prohibiting FDA from taking any action under the 2011 Guidance pending resolution of this action on its merits;

4.   Expedite resolution of this action on the merits;

5.   Awarding such other and further relief as the Court deems just and proper.

Dated:  October 14, 2016

Respectfully submitted,

G. Calvin Hayes
FBN 558702
BUCHANAN INGERSOLL & ROONEY PC
401 E. Jackson Street
Suite 2400
Tampa, FL 33602 - 5236
Telephone:     (813)222.1136
Facsimile:      (813)222.8180

*Counsel for Plaintiffs Virtus Pharmaceuticals, LLC
and Virtus Pharmaceuticals OPCO II, LLC.*

Donald J. Mizerk
John A. Sholar, Jr.
HUSCH BLACKWELL, L.L.P.
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Telephone:     (312) 655.1500
Facsimile:      (312) 655.1501

*Trial Counsel for Plaintiffs Virtus Pharmaceuticals,
LLC and Virtus Pharmaceuticals OPCO II, LLC.*

*Pro Hac Vice Admission Pending*